IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KARON ROCHA,
      Plaintiff,

vs.                              Case No. 1:05cv24/MMP/EMT
JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
      Defendant.

_____/

**<u>REPORT AND RECOMMENDATION</u>**

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      Plaintiff filed an application for DIB on November 26, 2002, alleging an onset of disability on January 21, 2002, although she later amended the onset date to August 1, 2002 (Tr. 44, 46-48, 11).[1]  The application was denied initially and on reconsideration (Tr. 21-22, 25-29).  Plaintiff filed

_____

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on April 21, 2005 (Doc. 8).

a request for a hearing before an administrative law judge ("ALJ"), and a hearing was held on May 13, 2004 (Tr. 32, 209-42).  On August 19, 2004, an ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 11-20).  On December 4, 2004, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4-6).  The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.    FINDINGS OF THE ALJ

On August 19, 2004, the ALJ made several findings relative to the issues raised in this appeal (Tr. 11-20).  The ALJ found that: 1) Plaintiff met the insured status requirements of the Act as of the alleged onset date; 2) Plaintiff has not engaged in substantial gainful activity since the alleged onset; 3) Plaintiff has "severe" impairments, including disorders of the back and affective mood disorder, but her obesity and hepatitis C impairments are not severe; 4) her impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; 5) Plaintiff's allegations of pain and functional limitations are not fully credible; 6) Plaintiff retains the residual functional capacity ("RFC") to occasionally lift and carry ten pounds; sit for approximately six hours in an eight-hour day, but no more than one hour at a time; stand and walk, with customary breaks, for approximately two hours in an eight-hour day; however, she cannot repetitively reach overhead; lift, bend, stoop, push/pull, or climb stairs; work around unprotected heights or dangerous moving equipment; climb ladders, ropes, or scaffolds; or perform jobs requiring production goals; additionally, Plaintiff can do simple, non-complex tasks and can maintain attention at such tasks for at least two hours at a time, but she cannot maintain concentration for extended periods; her supervision should be direct and non-confrontational; and changes to the work setting should be gradual and well-explained; 7) Plaintiff cannot perform any past relevant work; 8) she is a younger individual; 9) she has a limited education; 10) she has not acquired skills that will transfer to other jobs within her RFC; 11) Rules 201.24 and 201.18 of the Medical-Vocational Guidelines and the vocational expert's testimony demonstrate that Plaintiff has the RFC to perform jobs existing in significant numbers in the economy; samples of such jobs, all of which are sedentary and afford a sit and/or stand option,

include automatic machine tender, security monitor, and bench worker; and 12) Plaintiff is not disabled within the meaning of the Social Security Act and, therefore, not entitled to DIB (Tr. 19-20).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment

must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps.  The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal History

Plaintiff testified at a hearing before an ALJ on May 13, 2004 as follows (Tr. 214-35).  She was forty-six years old and lived in an apartment with her two children, aged thirteen and eighteen (Tr. 214, 229).  She completed the tenth grade and has never received special job training (Tr. 214,

217).

Plaintiff testified that her last job was at Papa Johns (Tr. 214-15).  She could not remember exactly when she worked there; she thought it was in 2002, but also stated it was before her back surgery (Tr. 214).[2]  She began there as a delivery driver and later worked in the store folding boxes and making pizza (Tr. 215).  She quit that job, after being told she should do so because she could not fulfill the job requirements, such as making pizza, due to her back pain (*id.*).  She testified that she did not seek another job because she did not feel she could fulfill job requirements (Tr. 224-25).  Plaintiff also testified that she had a job working as a sitter/companion for approximately three or four weeks, although it is unclear when she held that position (Tr. 227-28).

Prior to working at Papa John's, Plaintiff worked as a cashier at a Murphy USA gas station (Tr. 215).  She left that job because stocking was added to her job responsibilities, and she was unable to stock and had trouble standing for long periods (Tr. 215-16).  Before working at Murphy USA, Plaintiff worked at Wal-Mart as a cashier and began that employment in the fall of 2001 (Tr. 216).  She injured herself lifting a bag of dog food and could no longer work as a cashier, so she was assigned work as a greeter (Tr. 216-17).  However, she was unable to work as a greeter because she could not push carts or stand for long periods, and she left her Wal-Mart job permanently "a couple days" after her injury (Tr. 217).[3]  Prior to working at Wal-Mart, Plaintiff did residential and construction cleaning "off and on for . . . about ten years" (*id.*).  She also worked as a waitress and at a golf course "off and on for about ten to fifteen years" (*id.*).

Plaintiff's back problems began when she injured herself working at Wal-Mart (Tr. 218).  Dr. Aust[4] is the last doctor who treated Plaintiff for back problems, and he last her on September 11, 2002 (*id.*).  He suggested a second back surgery, but Plaintiff refused because the first surgery did not help (Tr. 219).  She sometimes feels worse than she did before her surgery, and since the

---

[2]The medical records reflect that Plaintiff's back surgery, a fusion, was on January 23, 2002 (Tr. 119-21, 219).

[3]Plaintiff later settled a Worker's Compensation suit, apparently related to this injury, for approximately $72,000.00 (Tr. 228-29).

[4]The hearing transcript refers to "Dr. Oss"; however, from the medical records it appears "Dr. Aust" is the correct name.

surgery, her primary problems have been pain and immobility (Tr. 220).  She took prescription pain medications when she was under Dr. Aust's care; however, at the time of the hearing (May 2004) she was taking over-the-counter pain relievers, which have little effect on her pain (Tr. 220-21).  She has tried other measures to relieve her pain, such as back massages, heating pads, ice packs, and lying on the floor (Tr. 221).  On a daily basis, the pain is a six to a seven on a scale of one to ten, with one being a mild annoyance and ten being excruciating pain (*id.*).

When Plaintiff does chores, such as laundry, she does only a little bit and then has to sit and rest (Tr. 221).  If she does not rest, the pain will increase and she will have to either take more medicine or lie down until the pain decreases (Tr. 222).  She probably takes at least twenty to twenty-five breaks in a day (Tr. 223).  She does not take naps during the day on a regular basis and usually gets four to five hours of sleep off and on through the night (*id.*).

On a typical day, Plaintiff gets up and gets her children off to school (Tr. 222).  She will start cleaning the house, then sit and rest for fifteen or twenty minutes (*id.*).  After resting, she will return to her activity and rest again when needed (*id.*).  She drives at times, but usually has someone drive her to run errands because it is more comfortable to sit in the passenger seat (*id.*).  She estimated that she drives approximately forty percent of the time (*id.*).  Her neighbor or older son usually accompanies her when she goes grocery shopping (Tr. 231).  Her children typically carry the groceries into the house, but sometimes she will carry light bags, although she is capable of lifting a gallon of milk (*id.*).  She cannot walk far without getting tired, and she has trouble sitting still for more than ten or fifteen minutes (Tr. 232).

Plaintiff intended to enroll in GED classes, but she was told that she would be treated like other students and get only two breaks in four hours (Tr. 225).  She did not enroll because she "couldn't get up when [she] needed to" (*id.*).  Plaintiff can no longer do yard work and has a difficult time doing activities with her children (Tr. 223).  She has gained more than one-hundred pounds since her injury due to depression and inactivity (Tr. 224, 227).  She is five feet one inch tall and weighs two-hundred and sixty-two pounds (Tr. 227).  Her inability to work and be independent make her feel worthless (Tr. 225).  She has been to counseling, but it has not helped (Tr. 225-26).  She took medication for depression at one time, but was not taking any at the time of the hearing (Tr. 230).

B.      Relevant Medical History

Plaintiff's medical records begin on October 18, 1999, when she was initially evaluated for depression at the C.E.D. Mental Health Center (Tr. 151-56).  She returned for individual therapy on several occasions, and her last visit was on November 4, 2002 (Tr. 137-56).

Plaintiff first saw Gagan Sood, M.D., at the University of Alabama ("UAB") Liver Center on March 2, 2000 for evaluation of Hepatitis C, which had previously been detected by routine laboratory testing (Tr. 162-64).  Plaintiff complained of fatigue, body ache, muscle weakness, lack of energy, and at times swelling of the legs, pain in the joints, and itchy skin rash (Tr. 162).  Dr. Sood documented that Plaintiff had liver disease, but it was well-compensated and her liver transaminases were normal (Tr. 163).  Dr. Sood instructed Plaintiff to lose weight, recheck her cholesterol and triglycerides, avoid alcohol completely, quit smoking, and return in six months (*id.*).  Plaintiff returned to the Liver Center on June 26, 2000 (Tr. 160-61).  Her transaminases remained normal, and she was instructed to return for follow up in six months (Tr. 160). Plaintiff's next visit was on January 6, 2003, and she saw Joseph R. Bloomer, M.D. (Tr. 158).  Dr. Bloomer's assessment was chronic Hepatitis C with persistently normal liver chemistries, and Plaintiff was instructed to follow up in six months to one year (Tr. 159).

Plaintiff was first seen by Gilbert M. Aust, M.D., on March 8, 2000 with complaints of back pain secondary to her injury at Wal-Mart (Tr. 136).  Plaintiff reported that when she tried to do any activity, it put her back into spasms (*id.*).  On physical examination, she had "fairly good" flexion and extension, no motor or sensory deficits, and negative straight leg raise and Bowstring sign (*id.*).  Deep tendon reflexes were 2+ in the knee and ankle (*id.*).  X-rays showed spondylolisthesis[5] at L4-5, and Dr. Aust's diagnosis was spondylolisthesis at L4-5 with superimposed strain (*id.*).  Dr. Aust explained to Plaintiff that she had the underlying condition for a long time, which predisposed her

---

[5]Spondylolisthesis is the forward movement of one vertebra in relation to an adjacent vertebra. Spondylolisthesis, available at *http://www.medilexicon.com/searches/medterms.php* (last visited February 13, 2006). The movement of the vertebra causes stenosis, or narrowing, of the spinal canal.  Spondylolisthesis, available at *http://*www.emedicine.com/radio/topic651.htm (Last updated May 3, 2004).  Spondylolisthesis may not cause symptoms for years (if ever) after the slippage has occurred.  Adult Isthmic Spondylolisthesis, available at *http://www.spine.org/articles/spondylolisthesis.cfm* (last visited February 13, 2006).  If a person has symptoms, they may include low back and buttock pain, numbness, tingling, pain, muscle tightness or weakness in the leg, increased sway back, or a limp.  *Id.*  The symptoms are usually aggravated by standing, walking, and other activities, while rest will provide temporary relief. *Id.*

to back injuries and was likely causing her problems (*id.*).  He planned to try medications and obtain an MRI, but if her problems continued he believed she might require surgery (*id.*).

Plaintiff returned to Dr. Aust on April 3, 2000 and reported that prolonged standing or any lifting, bending, or stooping aggravated her condition (*id.*).  Dr. Aust did not think she could work unless her job at Wal-Mart was modified to a greeter's job with a sit/stand option (*id.*).  He recommended lumbar decompression and fusion of L4-5 because Plaintiff had not responded to conservative measures (*id.*).

Plaintiff presented to Martin P. Jones, M.D., on May 4, 2000 with a chief complaint of back pain secondary to her Wal-Mart injury that occurred on October 15, 1999 (Tr. 114).  Plaintiff reported numbness in her right leg and pain in her lower back, but denied bowel or bladder dysfunction (*id.*).  Plaintiff was taking no medications (*id.*).  She reported that she had been to physical therapy, which did not help, and she wondered if anything else could be done (*id.*).  She explained that she had previously seen Dr. Aust and that he had recommended surgery (*id.*).

Dr. Jones documented that Plaintiff was a morbidly obese female in no acute distress (*id.*).  She had some tenderness to deep palpation of the low lumbar spine, but was able to forward flex 85 degrees, extend 15 degrees, and laterally bend 25 degrees to either side (*id.*).  Plaintiff had negative straight leg raise bilaterally, and her motor strength in the lower extremities was equal and "5/5" (*id.*).  Deep tendon reflexes were 2 and symmetrical, and sensation was grossly intact (*id.*).

Plaintiff's x-rays revealed advanced lumbar degenerative disk disease at the L4-5 level with a grade I spondylolisthesis and some degenerative changes at L5-S1 (Tr. 115).  Her MRI basically reflected the same findings as her x-rays (*id.*).  Dr. Jones opined that Plaintiff's only option was a spinal fusion (*id.*).  However, given her weight, he felt she might not have a very good outcome (*id.*).  In Dr. Jones' opinion, the degenerative disease at the L4-5 level and the spondylolisthesis predated her injury, and at most the injury was a minor aggravation that would not have resulted in an inability to work since her injury (*id.*).  According to Dr. Jones, Plaintiff's chances of successfully returning to work after a spinal fusion was close to zero, although Dr. Jones did not indicate whether he was referring to any type of work or whether he meant Plaintiff's previous work (*id.*).

Plaintiff was seen by William C. Woodall, M.D., on August 7, 2000 for continued low back pain with a burning sensation in her lower back and into her hips (Tr. 117).  She was taking Prozac,

pain medications, and anti-inflammatory medications at that time (*id.*).  On physical examination, Dr. Woodall noted that Plaintiff was an overweight woman in no acute distress (*id.*).  Her range of motion in her back was normal, but she had mild pain at the extremes of flexion and extension (Tr. 117-18).  She had no real tenderness on palpation (Tr. 118).  Straight leg raising was mildly positive at about 90 degrees (*id.*).  Motor and sensory exams were normal and deep tendon reflexes were 2+ at the knees and ankles with "down going" toes (*id.*).  Dr. Woodall's impression was spondylolisthesis at L4-5 (*id.*).  He believed this was a congenital problem, and the accident caused it to become symptomatic (*id.*).  He informed Plaintiff she could try a lumbar brace to see if it helped her symptoms, but he did not think anything except surgery would improve her status (*id.*).

Plaintiff decided to have surgery and was admitted to the hospital on January 23, 2002 for a decompression laminectomy at L4, followed by a L4 to L5 bilateral lateral fusion (Tr. 119-21).  Dr. Aust performed the surgery, and Plaintiff was discharged three days later with a prescription for Tylox (*id.*).

On February 7, 2002, Plaintiff was seen in Dr. Aust's office for follow up (Tr. 133).  Her surgical wound was well-healed and she was doing "fairly well" (*id.*).  She was given a prescription for Lorcet 10 and instructed to return in one month (*id.*).  When Plaintiff returned on March 4, 2002, her hardware was in proper position and her bone graft appeared to be taking (Tr. 132).  Dr. Aust informed her that she could return to work with no lifting over twenty pounds, and no repetitive lifting, bending, stooping, pushing, pulling, or climbing (*id.*).  Plaintiff reported that she felt good on some days, but on other days she was still sore and hurting (*id.*).  Dr. Aust explained that this was normal for her stage of healing, and he instructed her to continue increasing activities and return in six weeks (*id.*).

Plaintiff returned to Dr. Aust on April 24, 2002, and her fusion was in good position and her x-rays looked good (Tr. 131).  She stated that she continued to have difficulty working three to four hours per day, but Dr. Aust made no changes to her current restrictions (*id.*).  He prescribed Vioxx and Flexeril and instructed her to return in two months (*id.*).  She returned on June 11, 2002 and reported continued trouble doing any type of repetitive work (Tr. 130).  Dr. Aust thought they should keep Plaintiff's "current restrictions as permanent," and he instructed her to return in three months (*id.*).  Her fusion looked solid, but Dr. Aust planned to repeat x-rays at the next visit (*id.*).

Plaintiff returned to Dr. Aust on September 11, 2002 (Tr. 129).  She reported continued pain, much of which she had before surgery (*id.*).  Dr. Aust was concerned that she might have damage inside a disk above or below the fusion and recommended that she have discograms to determine the source of her pain (*id.*).  If the discograms were negative, he did not think he could do anything further for her, but if they identified the pain source, it was possible that an extension of her fusion could help (*id.*).

      C.      Other Information Within Plaintiff's Claim File

Patsy V. Bramlett, C.R.C., L.P.C., prepared a vocational assessment on September 13, 2001, (Tr. 203-08).  According to Ms. Bramlett, as a result of a lifting injury, Plaintiff aggravated a non-symptomatic, pre-existing back condition and became unable to continue her employment at Wal-Mart as a cashier (Tr. 207).  Post-injury, Plaintiff attempted employment as a cashier, companion, and delivery driver, but had to discontinue these jobs due to back pain and missed work (*id.*).  Ms. Bramlett documented that Plaintiff was unable to return to any previous employment due to Dr. Aust's restrictions (i.e., limited light employment with no repeated bending, stooping, or lifting and limited standing/sitting) (*id.*).  Plaintiff had no GED or high school diploma and was not a candidate for clerical/desks jobs (*id.*).

According to Ms. Bramlett, Plaintiff's ability to work at that time was "very questionable" (*id.*).  Plaintiff was "in dire need of a spinal fusion to improve her back condition and relieve her pain" (*id.*).  Ms. Bramlett considered Plaintiff to have a Vocational Disability Rating of 100% (*id.*).  However, she noted that Plaintiff "may require a repeat vocational assessment should her medical condition change significantly, such as with a fusion . . .." (Tr. 208).

On March 3, 2003, George S. Buckner, M.D., examined Plaintiff at the request of the Disability Determination Service (Tr. 165-67).  Plaintiff reported her back injury at Wal-Mart in October 1999 and that an x-ray subsequent to her injury showed spondylolisthesis, which was presumed to exist prior to her injury (Tr. 165).  She was first treated with medication and physical therapy, but later had back surgery in January 2002 (*id.*).  Plaintiff also reported that she continued to experience lower back pain radiating down her right leg to the knee, which she described as "4/10 [constantly] with exacerbations up to 8/10," as well as numbness in her buttock down to her knee posteriorly on the right (*id.*).  She was being treated with Ultram and Flexeril, but had not used a

brace or attended physical therapy after her surgery (*id.*).  Plaintiff stated she could dress herself, but could not buckle her shoes (*id.*).  She was able to take care of her home and children, but stated it took quite some time to do her housework (Tr. 165-66).  Her sons help her with vacuuming and mopping because those activities cause her pain (Tr. 166).  She spends much of her time reading and watching television and estimated that she lies down for fifteen to twenty minutes three or four times a day, and occasionally lies down for several hours (*id.*).  Pain frequently wakes her up at night, and driving bothers her a great deal (*id.*).

On physical examination, Dr. Buckner noted that Plaintiff walked with a normal gait pattern and could heel and toe walk adequately (*id.*).  She could squat down to 90 degrees of hip and knee flexion and arise from the position with her hand on the examining table (*id.*).  Plaintiff could flex forward to 60 degrees and extend to 20 degrees with pain at those points (*id.*).  She had no tenderness on palpation and negative compression and rotation tests (*id.*).  Motor examination revealed "5/5" strength in all muscle groups tested (*id.*).  There was some mild giving away on the right, presumably due to pain inhibition (*id.*).  Sensory examination revealed no loss in the foot or leg, and deep tendon reflexes were 2+ bilaterally (*id.*).  Straight leg raise was negative in a sitting position and slightly positive in a supine position at 45 degrees on the right and 60 degrees on the left; however, Dr. Buckner did not consider this significant enough to be a positive Waddell's sign[6] (*id.*).

X-rays showed a lateral mass fusion that appeared to be solid (*id.*).  Dr. Buckner's impression was: 1) status post lumbar laminectomy and fusion of L4-L5, and 2) spondylolisthesis at L4-L5 (Tr. 165).  He concluded that Plaintiff had "ample objective evidence of her disease including her surgical scars and her findings on x-ray.  She [had] no evidence of symptom magnification with Waddell signs being negative." (Tr. 167).

On March 10, 2003, Plaintiff underwent a psychological evaluation by Jon G. Rogers, Ph.D. (Tr. 168-72).  She arrived on time and her appearance and hygiene were good (Tr. 170).  Her speech was spontaneous, conversation was normal, mood appeared normal, and orientation was good (*id.*).

---

[6]Waddell's signs are a group of physical signs in patients with low back pain that are thought to be indicators of a non-organic or psychological component to pain.  Waddell's Signs, available at *http://en.wikipedia.org/ wiki/Waddell's_signs* (last updated January 6, 2006).

Case No. 1:05cv24/MMP/EMT

Plaintiff reported that she began mental health treatment in approximately 1993 for depression and anxiety (Tr. 168). She sought treatment due to sexual abuse she experienced at ages nine and ten (*id.*). She reported that treatment, therapy, and medications had not helped her (*id.*).

Plaintiff also reported that she was currently experiencing the following diagnostic symptoms of depression: depressed mood, not experiencing pleasure, insomnia, fatigue, difficulty concentrating and making decisions, and feeling worthless and hopeless (*id.*). She reported attempting suicide twice, most recently six or seven years ago (*id.*). She also reported a pattern of interpersonal relationships characterized by instability (*id.*). Dr. Rogers opined that Plaintiff demonstrated impulsivity by engaging in potentially self-damaging behavior, including drinking and driving, using drugs, and attempting suicide (*id.*). Plaintiff reported a problem with daily episodes of anger in which she curses, yells, throws things, and hits walls (*id.*). Plaintiff stated she had headaches, high blood pressure, Hepatitis C, and daily pain in her lower back (Tr. 169). Her medications included Ultram and Flexeril (*id.*).

Plaintiff reported smoking two or more packs of cigarettes a day and stated that she had a drinking problem for eight to ten years (Tr. 170). She last drank eight months ago (*id.*). She also reported abusing marijuana, LSD, cocaine, and diet pills and that her habits were funded through friends' gifts (*id.*). She last smoked marijuana the day before her appointment with Dr. Rogers and had taken diet pills the day of her appointment (*id.*).

Plaintiff reported that her daily activities included personal hygiene, watching television, housekeeping, and running errands (Tr. 169). She washes clothes, cooks meals, washes dishes, and pays the bills (*id.*). Dr. Rogers documented that Plaintiff was able to function independently, but the quality of her daily activities was below average (Tr. 171). Dr. Rogers' diagnosis was depressive disorder, pain disorder associated with psychological factors and general medical condition, cannabis abuse, headaches, high blood pressure, Hepatitis C, daily pain in her lower back, and psychosocial stress stemming from her difficulties in relation to her occupational problems (Tr. 171-72). He noted that due to drug use, Plaintiff would not be able to manage her financial benefits, and he documented that Plaintiff's Global Assessment of Functioning ("GAF") was 51[7] (Tr. 172-73).

---

[7]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. Global Assessment of Functioning, available at *http://www.behavenet.com/capsules/disorders/GAF.htm* (last visited February 13, 2006). It may be expressed as a

On March 21, 2003, H. Gordon Mitchell, M.D., completed a Physical RFC Assessment (Tr. 175-82). Dr. Mitchell opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand and/or walk or sit about six hours in an eight-hour workday (Tr. 176). Plaintiff's ability to push and pull was unlimited (*id.*). Plaintiff was occasionally able to climb ramps and stairs, but never able to climb ladders, ropes, or scaffolds (Tr. 177). She was frequently able to balance and kneel and occasionally able to stoop, crouch, and crawl (*id.*). No manipulative, visual, or communicative limitations were established (Tr. 178-79). Plaintiff was to avoid concentrated exposure to vibration and all exposure to unprotected heights, but otherwise had no environmental limitations (Tr. 179).

On March 24, 2002, Kenneth Warren, Ph.D., completed a Mental RFC Assessment (Tr. 183-85). Dr. Warren opined that Plaintiff was "not significantly limited" in the following abilities: to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms, as well as perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to get along with coworkers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others (Tr. 183-84). Dr. Warren opined that Plaintiff was "moderately limited" in the following abilities: to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond

---

numerical score. *Id.* A score of 51 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Global Assessment of Functioning, available at *http://dpa.state.ky.us/library/manuals/mental/Ch22.html* (last visited February 13, 2006).

appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting (*id.*).  Dr. Warren found no "marked" limitations (*id.*).  According to Dr. Warren, Plaintiff could maintain attention for at least two hours in an eight-hour period, but could not maintain concentration for extended periods (Tr. 185).  He noted that her contact with the public should be casual and that criticism from supervisors and co-workers should be non-confrontational (*id.*).  Finally, he noted that changes in the work place should be introduced gradually (*id.*).

Dr. Warren also completed a Psychiatric Review Technique on March 24, 2003 (Tr. 187-201).  He documented that Plaintiff had depressive syndrome, an affective disorder (*see* 20 C.F.R. Part 404, Subpt. P, Appx.1, Listing 12.04), that was characterized by anhedonia, sleep disturbance, decreased energy, and difficulty concentrating or thinking (Tr. 190).  However, Plaintiff's affective disorder did not satisfy the requirements of paragraph C of Listing 12.04 (Tr. 198).  He also documented that Plaintiff had a substance addiction disorder (*see* 20 C.F.R. Part 404, Subpt. P, Appx.1, Listing 12.09); namely, cannabis abuse, but it did not satisfy the diagnostic criteria of Listing 12.09 (Tr. 195).  As a result of both disorders, Plaintiff had a moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; but she had no repeated episodes of decompensation and no "marked" limitations (Tr. 197).

V.      DISCUSSION

Plaintiff raises three issues on appeal (Doc. 10 at 1, 16-30).  Plaintiff contends the ALJ erred: 1) in failing to ask the vocational expert ("VE") a hypothetical question that included all of her impairments (Doc. 10 at 1, 16-20); 2) in finding that her obesity was not severe and did not meet a listing (*id.* at 1, 20-22), and 3) in finding that her subjective complaints of pain were not credible (*id.* at 1, 22-30).  Defendant disputes each of Plaintiff's contentions and asserts that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed (Doc. 13).

A.      Hypothetical Question

A hypothetical question must comprehensively describe a claimant's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."

In the instant case, the ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work experience who: experiences moderate pain with a moderate effect on her ability to concentrate; could do simple, but not complex tasks; could maintain attention and concentration for two hours at a time, provided customary breaks were given; had minimal and casual contact with the general public and coworkers, direct and non-confrontational supervision, and gradual and well-explained changes in the workplace; could occasionally lift and carry ten pounds; could stand and walk up to two hours in an eight-hour work day with customary breaks; could sit approximately six hours in an eight-hour work day, but could not sit for more than one hour at a time; did not have to meet production quotas; could not do repetitive reaching, lifting, bending, stooping, pushing, pulling, or climbing of stairs; is unable to work around unprotected heights or dangerous moving equipment; could not climb ladders, ropes or scaffolds; and could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (Tr. 236-38).  The VE opined that, with these hypothetical limitations, the person could not return to the type of work previously performed by Plaintiff, but the person could perform jobs in the local or national economy such as

automatic machine tender, with 1,500 such jobs in north central Alabama;[8] security monitor, with 1,000 such jobs in north central Alabama; and non-production assembly jobs, with 1,500 to 2,000 jobs in north central Alabama (Tr. 238).   The VE further testified that each cited job was sedentary and allowed flexibility in sitting and standing (*id.*).

Plaintiff contends the above hypothetical question does not include her back and mood disorder impairments and/or the combined effect of those impairments (Doc. 10 at 17).   In support, Plaintiff cites to the records of Dr. Jones dated May 4, 2000, prior to Plaintiff's spinal fusion (January 23, 2002) and long before her alleged onset date (August 1, 2002) (*id.*).   Plaintiff also cites to Ms. Bramlett's vocational assessment of September 13, 2001 (Doc. 10 at 18-20).   However, the ALJ properly discounted this evidence as it is untimely and has little, if any, bearing on Plaintiff's abilities during the time frame relevant to her claim (Tr. 17, 203-08).   The ALJ specifically noted that the vocational assessment was performed prior to Plaintiff's fusion surgery and does not reflect her abilities following the procedure, especially in light of Ms. Bramlett's statement that Plaintiff "may require a repeat vocational assessment should her medical condition change significantly, such as with a fusion" (Tr. 17, 208).   The ALJ is entirely correct in disregarding these records.   Moreover, it is proper to give less weight to the opinion of a one-time examiner, such as Dr. Jones or Ms. Bramlett.   *See* 20 C.F.R. § 404.1527(d)(2).

Plaintiff further contends that the hypothetical question should have included Dr. Aust's recommendation in September 2002 that Plaintiff undergo discograms to determine the source of her pain, due to his concern that Plaintiff may have damage inside a disk (Doc. 10 at 18).   It is accurate that Dr. Aust made such a recommendation, but the record contains no evidence demonstrating that Plaintiff followed Dr. Aust's advice.   In fact, Plaintiff admitted she never saw Dr. Aust after September 11, 2002 (Tr. 218) and, as noted by the ALJ, the record contains "little evidence of any medical care since the alleged onset date" (Tr. 17).   Nonetheless, the ALJ's hypothetical question indicated that "moderate pain" existed, and properly included Dr. Aust's restrictions of no repetitive lifting, bending, stooping, pushing, pulling, or climbing (Tr. 16-17, 130, 132).   Moreover, although Dr. Aust restricted Plaintiff to lifting no more than twenty pounds, the

---

[8]Plaintiff was residing in Fort Payne, Alabama when she applied for benefits (*see* Tr. 48), and her hearing before the ALJ was held in Gadsen, Alabama (*see* Tr. 209).

ALJ's question restricted lifting abilities to no more than ten pounds (Tr. 16-17, 130, 132).

Finally, Plaintiff asserts that her mental limitations were not accurately reflected in the ALJ's question and cites to a C.E.D. Mental Health Center report dated August 5, 2002, which diagnoses her with depression (Doc. 10 at 18).  However, it is important to note that other records of the C.E.D. document Plaintiff's non-compliance with recommended treatment, such as missing four appointments, as well as Plaintiff's tendency to show up only when "in crisis," such as when she experienced marital problems (*see* Tr. 137, 139).  Plaintiff's noncompliance with treatment is a proper factor to consider in making a credibility determination.  *See* Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  Furthermore, "'[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.'"  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).  In this case, the therapist's statement that Plaintiff's noncompliance limited her improvement (*see* Tr. 137) indicates that Plaintiff's mental state was treatable.  Moreover, despite Plaintiff's noncompliance, the records document that Plaintiff's appearance, grooming, and affect were appropriate; her motor activity was calm; her thinking was "functional"; her judgment was average; and her orientation was normal (Tr. 140, 142).  Additionally, unlike other records in Plaintiff's file, the C.E.D. records do not contain any specific opinion regarding the effect of Plaintiff's diagnosis on her ability to work or function.[9]  Compare, for example, the records of Dr. Warren, which document that Plaintiff was moderately limited in carrying out detailed instructions and could not maintain concentration for extended periods; he felt her contact with the public should be casual, criticism from supervisors and co-workers should be non-confrontational, and changes in the work place should be introduced gradually (Tr. 185).  The ALJ included each of these considerations in the hypothetical question (*see* Tr. 237-38).

In addition to including the restrictions of Dr. Warren and Dr. Aust, a treating physician, the

---

[9] Plaintiff contends the diagnosis of "Axis V: 50" in August 2002 (i.e., a GAF of 50) (*see* Tr. 143) equates to "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school function (e.g., no friends, unable to keep a job)" (Doc. 10 at 18).  However, the C.E.D. records do not indicate which particular symptom(s) led to this diagnosis, as the diagnosis is not explained.  Moreover, Plaintiff was more recently assessed a GAF of 51 (*see* Tr. 172), which equates to "moderate symptoms," in a detailed report that explains the assessment (*see* Tr. 168-73 and footnote 7, above).

ALJ also included Dr. Mitchell's restrictions of lifting and carrying no more than ten pounds; not climbing ladders, ropes or scaffolds; not working around unprotected heights; and sitting no more than six hours in a day in one-hour increments (Tr. 17-18, 175-82).

Upon review of the entire record, this court concludes that ALJ's question comprehensively described Plaintiff's condition and is well-supported by competent and substantial evidence in the record.

B.      Obesity

Plaintiff asserts the ALJ erred in finding that her obesity was a non-severe impairment (Doc. 10 at 20).  Plaintiff further asserts that she meets the "old" obesity listing, 9.09A, and is therefore conclusively disabled and entitled to benefits (Doc. 10 at 20-22).  Defendant contends the ALJ properly evaluated Plaintiff's obesity under the current rules (Doc. 13 at 6-8).

The ALJ must determine at step two whether the claimant has a severe impairment.  An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities.  20 C.F.R. § 1520(c).  The burden at this step is on the claimant.  Chester, 792 F.2d at 131.  The Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe.
> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include-- (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment;  (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether impairments are severe.  The ruling provides in part:

> As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity].  An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a *slight*

*abnormality* or a combination of slight abnormalities which would have *no more than a minimal effect* on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856 (emphasis added).

In <u>Brady v. Heckler</u>, 724 F.2d. 914, 920 (11th Cir. 1984) the Eleventh Circuit used the same test adopted in SSR 85-28 to hold that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." The Eleventh Circuit has further interpreted the regulations to mean that "only claims based on the *most trivial impairments* [can] be rejected" at step two, noting that step two is a "threshold inquiry" and that a claimant's "burden at step two is mild." <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) (emphasis added).

In SSR 02-1p (September 12, 2002), the Commissioner specifically addressed the evaluation of disability claims involving obesity, including the determination of whether it is a severe impairment. "As with any other medical condition, [the Commissioner] will find that obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-1p. Obesity will be found "not severe" only if it is a slight abnormality that has no more than a minimal effect on an individual's ability to do basic work activities. *Id.* No specific weight or body mass index equates with a "severe" or "non-severe" impairment, nor do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid") establish whether or not obesity is a "severe" impairment for disability program purposes. *Id.* Rather, the Commissioner "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." *Id.*

In the instant case, the ALJ noted that the record contains a diagnosis of obesity, with Dr. Bloomer recording Plaintiff's weight at 246 pounds in March 2000 and Dr. Buckner recording her weight at 236 pounds in March 2003 (Tr. 15). However, the ALJ noted that Plaintiff failed to allege she was disabled as a result of her obesity (*see, e.g.,* Tr. 59) and that no treating or examining source

concluded that obesity significantly limited her ability to function (Tr. 15). The ALJ further noted Dr. Buckner's examination, which revealed that Plaintiff had a normal gait, could heel and toe walk adequately, and could squat to 90 degrees and arise from the squatting position with her hand on the examining table (Tr. 15, 165-67), as well as that Dr. Rogers' report that Plaintiff's motor activity was average (Tr. 15, 170). The ALJ stated the record failed to reveal that Plaintiff's obesity resulted in more than a minimal impact on her ability to perform work related activities (*id.*). Thus, the ALJ found that her obesity was a non-severe impairment within the meaning of the Act (*id.*). Although he found her obesity non-severe, the ALJ stated that the effect of the impairment would be fully considered under Social Security Ruling 00-3p (*id.*).[10]

Upon careful review of the record, this court concludes that the ALJ performed a proper individualized assessment of Plaintiff's obesity and its impact on her ability to function. As the ALJ correctly noted, the record fails to establish that Plaintiff's weight resulted in more than a minimal impact on her ability to perform work related activities. Accordingly, the ALJ properly concluded that her obesity was not a severe impairment.

Plaintiff additionally asserts that she meets the "old" obesity listing, 9.09A (Doc. 10 at 20-22). However, Listing 9.09 was deleted from the Listing of Impairments effective October 25, 1999. SSR 02-1p; SSR 00-3p. As Plaintiff's claim was filed in November 2002 and alleges an onset of disability in August 2002, it is clear that Listing 9.09A does not apply to her claim. The ALJ was not required to evaluate her obesity under a deleted listing, nor find her disabled if she qualified under that listing.

Finally, Plaintiff appears to contend she should have been found disabled at step three of the evaluation sequence because she meets Listing 1.04(C) (Doc. 10 at 22). According to Plaintiff, the evidence "should have been seen by the [ALJ as] being the equivalence case of a listing in light of the Commissioner's obesity ruling" (Doc. 10 at 22). To meet Listing 1.04(C), a claimant must have a disorder of the spine or spinal cord with "[l]umbar spinal stenosis resulting in pseudoclaudication,

---

[10]Plaintiff notes that the ALJ erroneously cited to SSR 00-3p (May 15, 2000), because that regulation was superceded by SSR 02-1p (September 12, 2002) (Doc. 10 at 22). Plaintiff is correct; however, the relevant sections of SSR 00-3p and SSR 02-1p are identical. *See* SSR 00-3p; SSR 02-1p (stating that no changes were made to SSR 00-3p, other than changes relating to the evaluation of mental disorders, musculoskeletal disorders, and disability in children claiming SSI benefits).

established by findings on medically appropriate acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." Inability to ambulate effectively means an extreme limitation of the ability to walk and is generally defined as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Listing 1.00(B)(2)(b).

In evaluating Plaintiff's claim at the third step, the ALJ noted that no treating or examining source concluded that Plaintiff's impairments met or equaled in severity any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15). In addition, the ALJ examined the record and found that the evidence did not support a conclusion that any listing was met or equaled (*id.*). The ALJ noted that Plaintiff's primary problem was back pain, standing bothered her, and she was not able to walk far (Tr. 12-13, 217, 220, 232). However, the ALJ noted Plaintiff's ability to walk without an assistive device, do housework, and drive her car (Tr. 12-13, 222, 232). The ALJ also noted that according to Dr. Mitchell, Plaintiff was able to stand and/or walk with normal breaks for a total of six hours in an eight-hour workday and climb ramps and stairs (Tr. 14, 176-77). Finally, even though the ALJ found Plaintiff's obesity non-severe, he considered its effects on Plaintiff's ability to function (Tr. 15). In sum, the ALJ's conclusion that Plaintiff's impairments did not meet or equal in severity any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 is supported by substantial evidence in the record. Specifically, his determination that Plaintiff did not meet any listing, including Listing 1.04(C), is supported by substantial evidence, as Plaintiff clearly did not have an "inability to ambulate effectively, as defined in 1.00B2b."

C.      The 11th Circuit Pain Standard and Evaluation of Plaintiff's Credibility

Plaintiff contends that the ALJ erroneously discounted her credibility and rejected her testimony regarding pain (Doc. 10 at 29). Defendant asserts that the ALJ's credibility determination was consistent with the Eleventh Circuit standard for evaluating pain (Doc. 13 at 3-6).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. §

416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206,

1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[11] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, supra, at 1548-49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

The ALJ found that Plaintiff's testimony of disabling pain and functional restrictions was disproportionate to the objective medical evidence (Tr. 17). The ALJ may properly find subjective complaints not credible if he articulates reasons that are supported by the record. See Jones v. Dept. of HHS, 941 F.2d 1529 (11th Cir. 1991). Here, the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's complaints. Specifically, the ALJ pointed out that Dr. Aust performed fusion surgery in January 2002, and at Plaintiff's follow up appointments in February, March, and April, the fusion was in good position (Tr. 16, 131-33). He further noted that during the

---

[11]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

March 2002 visit, Dr. Aust advised Plaintiff she could return to work, and at her visit in September 2002, the MRI revealed no abnormalities other than the previously diagnosed spondylolisthesis at L4-5 (Tr. 16, 129, 132).

The ALJ observed that Dr. Buckner's findings also failed to reveal abnormalities so severe as to reasonably be expected to result in the limitations claimed by Plaintiff, specifically noting Dr. Buckner's findings that: 1) Plaintiff had a normal gait and could heel and toe walk adequately; 2) she could squat to 90 degrees and arise by placing her hand on the examining table; 3) she could flex forward to 60 degrees and extend backward to 20 degrees; 4) she had no tenderness to palpation; 5) compression and rotation testing was negative; 6) motor examination revealed "5/5" strength, and sensation in the lower extremities was normal; 7) straight leg raising in the sitting position was negative and in the supine position was slightly positive; and 8) x-rays revealed the fusion was solid, with the only abnormality being the previously noted spondylolisthesis (Tr. 16, 166).

The ALJ noted that Dr. Mitchell's conclusions regarding Plaintiff's RFC[12] were generally consistent with the evidence as a whole, although Plaintiff was currently slightly more limited than she was at the time of Dr. Mitchell's review (Tr. 16).

Finally, the ALJ correctly observed that there is little evidence of medical care since Plaintiff's alleged onset date (Tr. 17). Moreover, the ALJ noted that Plaintiff was apparently receiving no medical care and was taking only over-the-counter medications at the time of her hearing (Tr. 17, 220-21). He further explained that it was reasonable to conclude that if Plaintiff experienced chronic pain at a level of 6 to 7, as she testified, she would seek professional medical care and noted that there was no indication she had been denied or refused medical attention (Tr. 17). Accordingly, the ALJ properly discounted Plaintiff's subjective complaints and articulated sufficient reasons, supported by the record, for doing so.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence

---

[12]Dr. Mitchell opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 176). Plaintiff's ability to push and pull was unlimited (id.). She was occasionally able to climb ramps and stairs, but never able to climb ladders, ropes, or scaffolds (Tr. 177). She was frequently able to balance and kneel and occasionally able to stoop, crouch, and crawl (id.). No manipulative, visual, or communicative limitations were established (Tr. 178-79). Plaintiff was to avoid concentrated exposure to vibration and all exposure to unprotected heights (Tr. 179).

and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

   Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

   At Pensacola, Florida this <u>27th</u> day of February 2006.


        */s/ Elizabeth M. Timothy*
        **ELIZABETH M. TIMOTHY**
        **UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**